**UNITED STATES of America, Appellee,**

v.

**Raymond CRUZ, also known as Raymond Diaz, Defendant–Appellant.**

**No. 97–1059.**

United States Court of Appeals, Second Circuit.

Argued Sept. 22, 1997.

Decided Sept. 22, 1998.

Clover M. Barrett, Brooklyn, NY, for Defendant–Appellant.

Alexander H. Shapiro, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty. for the Southern District of New York, Craig A. Stewart, Asst. U.S. Atty., New York City, of counsel), for Appellee.

Before: LEVAL and PARKER, Circuit Judges, and BAER, District Judge.*

---

* The Honorable Harold Baer, Jr., of the United States District Court for the Southern District of New York, sitting by designation.

**1.** The current version of U.S.S.G. § 2D1.1(b)(4) can be found at U.S.S.G. § 2D1.1(b)(6). Since

PARKER, Circuit Judge:

Raymond Cruz appeals from the judgment of the United States District Court for the Southern District of New York (Denise Cote, *Judge*) sentencing him, following a guilty plea, to 87 months imprisonment and imposing a special assessment of $50.00 for one count of possession of cocaine base with intent to distribute it in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A). In calculating Cruz's offense level under the Sentencing Guidelines, the district court considered information Cruz had disclosed during proffer sessions with the Government not only for the purpose of granting a reduction under the "safety valve" provision and waiving the mandatory minimum sentence, *see* U.S.S.G. §§ 5C1.2, 2D1.1(b)(4)[1]; 18 U.S.C. § 3553(f), but also for the purpose of enhancing Cruz's base offense level under U.S.S.G. § 1B1.3. Cruz contends that this was error; and that the district court should only have considered the information for the safety valve reduction and not for the base level enhancement. Cruz relies on U.S.S.G. § 1B1.8 and a Fifth Amendment challenge to the safety valve statute. For the following reasons, we affirm the judgment of the district court.

## I. BACKGROUND

On August 17, 1995, Cruz was arrested in Penn Station in Manhattan on an "Amtrak" train scheduled to depart for Lancaster, Pennsylvania, after police discovered marijuana in a gray bag that Cruz had been carrying. The bag also contained 67 grams of crack cocaine. In a post-arrest statement, Cruz confessed that he had bought the crack cocaine in Brooklyn and was planning to sell it in Pennsylvania.

Cruz was charged in a one count indictment filed on September 18, 1995, with possession of cocaine base with intent to distribute it, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A). Cruz pled guilty

Cruz was sentenced prior to the effective date U.S.S.G. § 2D1.1(b)(6) (November 1, 1997), we will continue to refer to U.S.S.G. § 2D1.1(b)(4) throughout this opinion.

to the charge on January 4, 1996. Pursuant to the plea agreement, the parties agreed that the base offense level applicable to Cruz's offense was 32 under U.S.S.G. § 2D1.1(c). Given a three-level reduction for acceptance of responsibility, see U.S.S.G. § 3E1.1, the total offense level contemplated by the plea agreement was 29.

At the time of the plea agreement, Cruz had an overall Criminal History Category ("CHC") of II: one point for a sentence of five years probation imposed on December 21, 1993 by the New York State Supreme Court, County of New York, for a conviction of larceny of an automobile in the 4th degree, see U.S.S.G. § 4A1.1(c); and two points for committing the charged federal narcotics offense while still serving his state probation sentence. See U.S.S.G. § 4A1.1(d). With a total offense level of 29 and a CHC of II, Cruz's sentencing range would have been 97 to 121 months. See U.S.S.G. § 5A (Sentencing Table). However, pursuant to the federal narcotics offense to which Cruz pled guilty, Cruz was required to serve a statutory minimum sentence of 10 years (120 months) incarceration regardless of the applicable Guidelines range. See 21 U.S.C. § 841(b)(1)(A)(iii); § U.S.S.G. § 5G1.1(c)(2).

Shortly after his guilty plea, Cruz entered into discussions with the Government about the possibility of cooperating. On February 7 and April 16, 1996, Cruz met with the Government pursuant to a proffer agreement ("Proffer Agreement") to explore the possibility of entering into a cooperation agreement. The Proffer Agreement provided in relevant part:

(1) Should any prosecutions be brought against [Cruz] by this Office, the Government will not offer in evidence on its case-in-chief, or in connection with any sentencing proceeding for the purpose of determining an appropriate sentence, any statements made by [Cruz] at the meeting, except in a prosecution for false statements, obstruction of justice, or perjury with respect to any acts committed or statements made during or after the meeting or testimony given after the meeting.

During the proffer sessions, Cruz revealed drug dealing involving 350 grams of crack cocaine that was part of the same course of conduct as the conduct to which he pleaded. After these sessions, the Government decided not to enter into a cooperation agreement with Cruz.

In September 1996, after the proffer sessions had been conducted, Cruz's state conviction for grand larceny was expunged in state court proceedings pursuant to New York State's youthful offender statutes. As a result, Cruz no longer had any criminal history points, see U.S.S.G. § 4A1.2(j), and therefore became eligible for so-called safety valve relief under 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2, that is, imposition of a sentence without regard to the statutory minimum sentence, as well as for a two-level downward adjustment under U.S.S.G. § 2D1.1(b)(4).[2]

2. Section 3553(f) provides that, in a case where a defendant is convicted of specified narcotics offenses, including 21 U.S.C. § 841:

the court shall impose a sentence pursuant to [the Sentencing Guidelines] without regard to any statutory minimum sentence if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that—
(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
(3) the offense did not result in death or serious bodily injury to any person;

(4) the defendant was not an organizer, leader, manager or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in [21 U.S.C. § 848]; and
(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.
18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2 (incorporating the language of 18 U.S.C. § 3553(f)).

The Government did not dispute that, once Cruz's state conviction was expunged, he met the first four conditions of the safety valve provision. In order to meet the fifth requirement, the Government proposed to defense counsel prior to sentencing that Cruz waive the non-disclosure provision contained in paragraph (1) of the Proffer Agreement and allow the Government to disclose to the district court the substance of Cruz's statements to the Government. In a telephone conversation with the AUSA on or about December 2, 1996, defense counsel agreed to the use of the proffer sessions as the safety valve interview, but objected to the use of the information in determining the guideline offense level.[3]

In a letter to the district court dated December 20, 1996, the Government recommended that Cruz receive the safety valve benefit, but only on the condition that the court take Cruz's prior drug trafficking into account in calculating Cruz's offense level. In response, Cruz's attorney claimed that Cruz was eligible for the safety valve provision but that Application Note 7 to U.S.S.G. § 5C1.2 and U.S.S.G. § 1B1.8 precluded the use of the information in the calculation of the base offense level.[4] Additionally, at the sentencing hearing, Cruz argued that, if he had not participated in the proffer sessions with the Government prior to becoming eligible for the safety valve consideration, he would not have had to disclose the relevant conduct in a safety valve interview because a requirement that a defendant disclose self-incriminating conduct other than that related to the offense for which the defendant is charged would violate his Fifth Amendment privilege against self-incrimination. Accord-

ingly, Cruz claims, since he could have avoided the base offense level enhancement under U.S.S.G. § 1B1.3 if he were providing the information for the first time in a safety valve interview, he should not now be penalized for having provided that information before he became eligible for the safety valve benefit.

Ruling from the bench, the district court rejected both arguments. The court held that Cruz had not entered into a "cooperation agreement" with the Government and therefore § 1B1.8 did not apply. The court explained that the Proffer Agreement was not a cooperation agreement as it did not possess the additional commitments (e.g., testifying) which are the hallmark of cooperation agreements. Cruz had simply entered into a "limited use session" in which he and the Government explored whether or not there would be a cooperation agreement.

The court rejected Cruz's argument that the safety valve provision imposed an unconstitutional condition on the defendant on the ground that § 5C1.2 "simply sets out a mechanism by which a defendant, should a defendant want to avail himself of the option, [can] get the benefits of the safety valve." Accordingly, because there was no dispute that the 350 grams of crack cocaine previously trafficked by Cruz was relevant conduct and would have to be disclosed under § 5C1.2 to obtain the safety valve adjustment, the district court held that the relevant conduct could properly be considered in imposing a sentence.

The district court found, however, that absent a "knowing and intelligent" waiver of paragraph (1) of the Proffer Agreement, the

---

**3.** Cruz also provided information about the quantity of cocaine that he had sold (350 grams of cocaine base) in a telephone conversation with the Government on or about December 18, 1996. The Government conceded at sentencing that this information was disclosed subject to the same objection that defense counsel had made with respect to the proffer sessions, namely that the information should not be considered for an increase in the base offense level.

**4.** Application Note 7 to U.S.S.G. § 5C1.2 provides, in relevant part:
 Information disclosed by the defendant with respect to subdivision (5) may be considered in

determining the applicable guideline range, except where the use of such information is restricted under the provisions of § 1B1.8....
 Section 1B1.8(a) provides:
 Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

court could not consider the information disclosed in the proffer sessions for any purpose under the Sentencing Guidelines. To ensure that Cruz's waiver was "knowing and intelligent," the district court presented Cruz with three options: (1) to impose a sentence without reference to the safety valve; (2) for the defendant to submit to a safety valve interview in order to see if he qualifies under § 5C1.2(5); (3) for the defendant to request that the information already provided to the government be used as the safety valve interview with the understanding that any relevant conduct revealed can be used to enhance his base offense level. Cruz chose the third option. The district judge accordingly determined that Cruz's base offense level was 34, which corresponded to the 350 grams of cocaine base trafficked by Cruz, and reduced the offense level by three points for acceptance of responsibility and a further two points for the safety valve adjustment provided by U.S.S.G. § 2D1.1(b)(4). With an offense level of 29 and a CHC of I, Cruz's sentence range was 87 to 108 months. The offense level proposed by Cruz (which included the safety valve reduction but not the base offense level enhancement) was 27, which carries a sentencing range of 70 to 87 months. The district judge sentenced Cruz to 87 months imprisonment, but noted that if the correct Guidelines range were in fact 27, as Cruz contended, she might sentence the defendant to a lower sentence.

## II. DISCUSSION

A. *Application of Section 1B1.8 to Cruz's Proffer Agreement*

■ Cruz argues on appeal, as he did below, that information provided in the proffer sessions should not have been used in determining his base offense level, citing Application Note 7 to § 5C1.2 and § 1B1.8. However, we agree with the district court that § 1B1.8 applies only where a defendant "agrees to cooperate with the government" and Cruz neither obtained the benefits nor the burdens of such a cooperation agreement in this case. The Proffer Agreement did not specify requirements that Cruz needed to meet to qualify for benefits, such as providing or developing information against others,

or testifying in court if called upon to do so. Defense counsel clearly understood, at the time of the proffer sessions, that the discussions with the Government were being held with the view to determining whether the parties would enter into a cooperation agreement. Certainly, the Government was under no obligation to enter into a cooperation agreement with Cruz and thereby provide the additional protection afforded by § 1B1.8, and it is clear in this case that the Government simply declined to do so.

Cruz relies on *United States v. Fant*, 974 F.2d 559, 564 (4th Cir.1992) for the proposition that, in Cruz's words, the Government should not be allowed to "wiggle out of it's promise on which the defendant was entitled to rely ... in providing information to the government." *Fant* is distinguishable from this case. In *Fant*, the court held it was error to increase the defendant's sentence for obstruction of justice based on information given to FBI agents acting as probation officers after the defendant entered into a negotiated plea agreement, relying on § 1B1.8. However, the court in *Fant* specifically found that, as a part of the plea agreement, the defendant had promised to cooperate with government officials in return for the government's promise not to use information given by the appellant to determine the applicable guideline range. 974 F.2d at 561–62. Additionally, the court found that the language of the agreement was based on § 1B1.8, and that the agreement itself expressly stated that it was a cooperation agreement. *Id.* at 560 (referring to the provision that stated that the restriction on use of the information shall not apply in the event of a breach of "a cooperation agreement.")

Alternatively, Cruz argues that § 1B1.8 is not limited to cooperation agreements, citing Application Note 5 to § 1B1.8, which refers to "information furnished by a defendant in the context of a defendant-government agreement." However, we are not persuaded that the broader description "defendant-government agreement" in Application Note 5 was intended to alter the plain meaning of the word "cooperate" in subsection (a) of § 1B1.8. We hold that § 1B1.8 does not cover proffer agreements of the type negotiated in

this case. Accordingly, subject to Cruz's Fifth Amendment argument, the information disclosed by him in the proffer sessions comes in, if at all, for both sentencing purposes.

### B. *The Safety Valve and the Fifth Amendment*

Cruz argues that the three options given to him by the district court at the sentencing hearing presented him with a "Hobson's choice." Cruz claims that if he had declined to waive the immunity of the proffer agreement, and agreed to submit to a safety valve interview with the government, he would have been compelled in this interview to reveal his 350 gram dealings because the government had already received this information from him. Alternatively, if the defendant had refused to waive the immunity in the Proffer Agreement, the information in the proffer sessions could not be used to satisfy the fifth requirement of the safety valve provision and Cruz would have been subject to the statutory minimum sentence of 120 months. Cruz claims that the only course open to him was to consent to the use of the proffer sessions for the safety valve and allow the information to enhance the base offense level.

■ Cruz's argument that he was penalized by these choices only has merit if his earlier dealings were not "part of the same course of conduct" as his offense and thus required to be disclosed to obtain the benefit of the safety valve. Cruz's counsel, however, conceded that the 350 grams were part of the same course of conduct. Thus, absent some constitutional infirmity in the safety valve's requirement that a defendant provide truthful information regarding the "offense of conviction and all relevant conduct," *see* U.S.S.G. § 5C1.2, Application Note 3; *see also United States v. Gambino,* 106 F.3d 1105, 1111 (2d Cir.1997), Cruz can be no worse off having

already disclosed that information to the Government. The only possible advantage Cruz could have obtained by not having spoken with the Government in his proffer sessions was improvement of his opportunity to deceive. If Cruz somehow could have undergone a safety valve interview without disclosing the relevant conduct, and managed to convince the Government that he had made a full and truthful disclosure, then Cruz might have obtained the advantage which he now claims he ought to receive, namely the benefit of the safety valve interview without disclosing the full range of his pertinent criminal activity. In essence, Cruz is contending that he should have had an opportunity to get away with a lie. We agree with the government that this would be an illegitimate tactical advantage that can hardly be countenanced as grounds for vacating the district court's sentence in this case.

Cruz argues, additionally, that he could have refused to answer questions in a safety valve interview regarding criminal conduct that was not related to the offense for which he was charged by asserting his constitutional right not to make self-incriminating statements. Cruz asserts that the position taken by the district court that the defendant is not being penalized for refusing to admit relevant conduct, but is simply being denied a benefit to which he was not entitled in the first place, has been rejected in this Circuit, citing *United States v. Oliveras,* 905 F.2d 623 (2d Cir.1990) (per curiam) and *United States v. Santiago,* 906 F.2d 867 (2d Cir.1990).

■ We review a sentencing court's interpretation of the safety valve provisions de novo. *United States v. Ortiz,* 136 F.3d 882, 883 (2d Cir.1997). The issue of whether the safety valve's requirement that a defendant admit to relevant conduct in order to gain a reduction in his sentence is a violation of the Fifth Amendment to the Constitution, is one of first impression in this Court.[5] In *Oliver-*

---

**5.** We note that other Circuits have considered a Fifth Amendment challenge to the safety valve provision and have held that the requirement that the defendant disclose relevant conduct is constitutional. *See United States v. Arrington,* 73 F.3d 144, 149 (7th Cir.1996) ("[R]equiring defendants to admit past criminal conduct in order to gain relief from statutory minimum sentences

does not implicate the right against self-incrimination."); *United States v. Washman,* 128 F.3d 1305, 1307 (9th Cir.1997) ("Section 3553(f) does not raise constitutional concern because it does not mete out *additional* punishment if a defendant decides not to disclose under § 3553(f)(5)") (emphasis in original).

as, the defendant pled guilty to a one count indictment charging him with selling two bags of PCP within one thousand feet of a school, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(D), and 845(a) (now codified as amended at 21 U.S.C. § 860). Oliveras sought the two-point reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility. The probation officer recommended to the sentencing court that Oliveras not receive the reduction because Oliveras continued to deny that he also possessed (with intent to distribute), at the time of the arrest, a further eight bags of PCP. The eight bags of PCP were the subject of a second count in Oliveras' original indictment, but that count was subsequently dropped by the government. The district judge denied the reduction, finding Oliveras' acceptance of responsibility to be "selective" as to his involvement. 905 F.2d at 625.

The Court of Appeals remanded for resentencing because it was unclear whether the district court refused to grant the acceptance of responsibility credit based on the defendant's refusal to admit that he possessed the additional eight bags of PCP. The Court construed § 3E1.1 "as granting credit to a defendant who has been found to have accepted full responsibility for conduct included in those counts to which he has plead guilty." 905 F.2d at 629. In a thoughtful decision, the Court analyzed the history of the acceptance of responsibility provision and its context, noting, among other things, that the phrase "relevant conduct," which is used throughout the Guidelines and which would have encompassed the eight bags of PCP, was not used in § 3E1.1. See id. at 629–631. Accordingly, the Court held that § 3E1.1 does not require a defendant to disclose conduct beyond the counts of conviction in order to receive a downward adjustment for acceptance of responsibility.

However, the Court in Oliveras also stated that:

> To require a defendant to accept responsibility for crimes other than those to which he has pled guilty or of which he has been

found guilty in effect forces defendants to choose between incriminating themselves as to conduct for which they have not been immunized or forfeiting substantial reductions in their sentences to which they would otherwise be entitled to consideration. As the First Circuit concluded ... "[c]learly, a defendant does not have a 'free choice to admit, deny, or to refuse to answer' if he knows he will be incarcerated for a longer period of time if he does not make the incriminating statements. The touchstone of the fifth amendment is compulsion, and the Supreme Court has recognized that imprisonment is one of a wide variety of penalties which can serve to trigger a constitutional violation."

Id. at 628 (quoting United States v. Perez–Franco, 873 F.2d 455, 463 (1st Cir.1989)). The Court's statement that if § 3E1.1 had required disclosure of conduct beyond the offense of conviction, § 3E1.1 would violate the Fifth Amendment, may well be characterized as dictum and not necessary to decide the case, because the Court held that in any event § 3E1.1 did not impose such a disclosure requirement. Regardless of whether it is properly characterized as dictum with respect to § 3E1.1, which was under consideration in Oliveras, it is not a controlling holding with respect to the safety valve provisions of §§ 3553(f), 5C1.2, and 2D1.1(b)(4), which were not. We do not consider this passage of Oliveras as controlling in answering whether the obligation to disclose relevant conduct not covered by the charge of conviction in order to qualify for the safety valve violates the Fifth Amendment.[6]

The Supreme Court has held that the government "may not impose substantial penalties because [an individual] elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." Lefkowitz v. Cunningham, 431 U.S. 801, 805, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977). The court in Oliveras relied on this principle and the "so-called 'penalty' cases," see Minnesota v. Murphy, 465 U.S. 420, 434, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), in concluding that the

**6.** Although we do not regard Oliveras as binding us on the instant appeal, we have nevertheless circulated this opinion among all active members

of this Court prior to filing, and no judge has objected to its filing. See Kramer v. Timer Warner, Inc., 937 F.2d 767, 774 (2d Cir.1991).

"the effect of requiring a defendant to accept responsibility for crimes other than those to which he pled guilty or of which he has been found guilty is to penalize him for refusing to incriminate himself." 905 F.2d at 626. However, the penalty cases have all involved some kind of loss or reduction from the status quo. For, example, the "sanction" threatened has been in the nature of revocation of probation, *see, e.g., Murphy,* 465 U.S. at 438, 104 S.Ct. 1136 (a state may not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege), or dismissal from employment, *see, e.g., Uniformed Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation,* 392 U.S. 280, 283, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968) (public employees may not be dismissed for refusing to waive their constitutional right against self-incrimination); *Gardner v. Broderick,* 392 U.S. 273, 278, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (police officer may not be discharged for refusal to waive immunity); *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (police officer's testimony given under threat of discharge for not answering questions may not be used in subsequent prosecution); *Cunningham,* 431 U.S. at 807, 97 S.Ct. 2132 (finding unconstitutional a state statute providing that if a political party officer who is subpoenaed by a grand jury to testify concerning the conduct of his office refused either to testify or to waive immunity, his term of office will terminate). A defendant facing a particular sentence, however, with the option of obtaining a lower sentence if he or she waives the Fifth Amendment privilege is not presented with the same "negative" sanction as presented in the penalty cases.[7]

We acknowledge that the benefit/penalty distinction is not entirely satisfactory, *cf. Oliveras,* 905 F.2d at 627–28, and there may well be instances where we would not find it controlling. However, a similar distinction was recognized by this Court in pre-Guidelines sentencing cases where the Court had to determine whether the sentencing judge simply took into account as a mitigating factor the defendant's voluntary cooperation with the authorities or impermissibly increased the sentence based on the defendant's refusal to cooperate. *See, e.g., United States v. Bradford,* 645 F.2d 115, 117 (2d Cir.1981) ("It is one thing to extend leniency to a defendant who is willing to cooperate with the government; it is quite another thing to administer additional punishment to a defendant who by his silence has committed no additional offense."); *see also United States v. Stratton,* 820 F.2d 562, 564 (2d Cir.1987) (recognizing that the distinction "between increasing the severity of a sentence for a defendant's failure to cooperate and refusing to grant leniency . . . may be difficult to apply"); *United States v. Roberts,* 445 U.S. 552, 557 n. 4, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980) ("We doubt that a principled distinction may be drawn between 'enhancing' the punishment imposed upon the petitioner and denying him the 'leniency' he claims would be appropriate if he had cooperated.")[8] We have continued to rely on the

---

**7.** The only time this can be the case for a defendant considering taking advantage of the safety valve reduction is where the defendant's prior conduct is so severe, or includes a quantity of drugs so large, that the increase in the base offense level under § 1B1.3 actually exceeds any reduction the defendant might obtain under the safety valve provision. In such cases, the defendant effectively does not have the safety valve option open to him or her, and accordingly no Fifth Amendment issue arises. It should be noted that this is not the case with Cruz, who was eligible for a lower sentence as a result of the information given to the government in the proffer sessions, even with the base offense level enhancement under § 1B1.3. And if that had not been the case, Cruz still would not have been penalized for having previously spoken with the government, because the district court gave him

the option of keeping the benefit of the protection in paragraph (1) to the Proffer Agreement by not having the evidence come in at all.

**8.** *But see Mallette v. Scully,* 752 F.2d 26, 34 (2d Cir.1984) (Newman, J., dissenting) ("I do not share the majority's view that this distinction is 'somewhat illusory,' though I acknowledge that doubts about the matter have been significantly expressed. I acknowledge the basis for such doubts, since it is obvious that the defendant who refuses to cooperate often receives a greater sentence than the defendant, under otherwise similar circumstances, who cooperates. Of course, that is true of every defendant whose sentence is greater than that of a defendant with mitigating circumstances. . . . But the defendant who does not cooperate has no cause for complaint if he receives the judge's tentative sentence, even

distinction at least in this context because "it is the only rule that recognizes the reality of the criminal justice system while protecting the integrity of that system." *Mallette v. Scully,* 752 F.2d 26, 30 (2d Cir.1984) (applying the distinction to determine whether the sentencing court impermissibly enhanced defendant's sentence because of his failure to cooperate or merely declined to show him leniency).

Moreover, in another line of cases, the Supreme Court has rejected the claim that the possibility of a "proper degree of leniency" or offer of a lower sentence in exchange for a guilty plea impermissibly compels a defendant to incriminate himself or herself. *See, e.g., Bordenkircher v. Hayes,* 434 U.S. 357, 365, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) (prosecutor's offer to accept a guilty plea to a lesser charge "no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution"); *Chaffin v. Stynchcombe,* 412 U.S. 17, 31, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973) ("Although every [plea bargain] has a discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable attribute of any legitimate system which tolerates and encourages the negotiation of pleas"); *Brady v. United States,* 397 U.S. 742, 751, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) ("We decline to hold, however, that a guilty plea is compelled and invalid under the Fifth Amendment whenever motivated by the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged."). In *Corbitt v. New Jersey,* 439 U.S. 212, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978), the Supreme Court upheld the constitutionality of a statutory scheme pursuant to which a defendant who pled *non vult* [9] to a murder, rather than proceed to a jury trial, could receive, at the discretion of the sentencing judge, the second degree murder sentence of up to thirty

years rather than the mandatory life imprisonment term for first degree murder. The Court stated:

> The cases in this Court ... have clearly established that not every burden on the exercise of a constitutional right, and not every pressure or encouragement to waive such a right is invalid. Specifically, there is no per se rule against encouraging guilty pleas. We have squarely held that a State may encourage a guilty plea by offering substantial benefits in return for the plea. The plea may obtain for the defendant "the possibility or certainty [not only of] a lesser penalty than the sentence that could be imposed after a trial and a verdict of guilty ...," but also of a lesser penalty than that required to be imposed after a guilty verdict by a jury.

*Id.* at 218–20, 99 S.Ct. 492 (quoting *Brady,* 397 U.S. at 751, 90 S.Ct. 1463). The Supreme Court also held that "withholding the possibility of leniency from [defendants who go to trial] cannot be equated with impermissible punishment so long as our cases sustaining plea bargaining remain undisturbed." *Id.* 99 S.Ct. at 500.

In our view, the choice presented to a defendant under § 5C1.2 between a sentence reduction with relief from the mandatory minimum sentence and waiver of his Fifth Amendment privilege is analogous to the choice confronting defendants in plea bargain cases. Contrary to the reasoning in *Oliveras* that a defendant will feel compelled to provide incriminating information to earn a reduction in his or her sentence, we hold that the choice confronting the defendant gives rise to no more compulsion than that present in a typical plea bargain. We do not believe that this choice, unlike the choice in the penalty cases, is " 'likely to exert such pressure upon an individual as to disable him from making a free and rational choice.' " *Garrity,* 385 U.S. at 497, 87 S.Ct. 616 (quoting *Miranda v. Arizona,* 384 U.S. 436, 464–65, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

though the tentative sentence would have been adjusted downward if he had cooperated") (citations omitted).

**9.** A *non vult* is a plea equivalent to nolo contendere. The defendant does not wish to contest the charge nor specifically admit it, although it is equivalent to a plea of guilty in a criminal case.

Moreover, like plea bargains, the purpose of conditioning the safety valve benefit on truthful disclosure of relevant conduct was not to force defendants to waive their Fifth Amendment privilege but to further another legitimate governmental goal. The legislative history of the Mandatory Minimum Sentencing Reform Act of 1994 ("MMSRA"), which contained the safety valve provision, indicates that the purpose of the statute was twofold: to "increase the effectiveness of existing controlled substance mandatory minimums by ensuring that those penalties are directly targeted toward relatively more serious conduct;" and to reform the then "current operation of mandatory minimums [under which] mitigating factors that are recognized in the guidelines and generally are considered in drug cases do not apply to the least culpable offenders except in rare instances." *See* Mandatory Minimum Sentencing Reform Act of 1994, H.R.Rep. No. 103–460, 103rd Cong., 2d Sess. (1994). As the Seventh Circuit explained in *United States v. Arrington,* 73 F.3d 144 (7th Cir.1996):

> Congress enacted the MMSRA in order to remedy an inequity in the old system, which allowed relief from statutory minimum sentences only if the government made a motion to reward the defendant's substantial assistance. The government generally makes substantial assistance motions only for defendants who provide new or useful information. Thus, under the old system, defendants who had more information to provide fared better, and these were often higher-level dealers whose greater involvement in criminal activity resulted in their having more information. "Mules," lower-level dealers, or defendants whose co-conspirators had already talked to the government often had no new or useful information to trade. Even if they told the authorities everything they knew, they did not receive departures under § 3553(e) and often received longer sentences than other, more culpable defendants.

*Id.* at 147–48. In other words, § 3553(f) "was intended to benefit defendants who wished to cooperate with the government (and in fact did everything they could to cooperate) but simply had no new or useful information to provide." *Id.* at 148.[10] Accordingly, in our view, the safety valve provision furthers a legitimate government goal and does not impose an unconstitutional condition on defendants seeking to take advantage of it.

For the foregoing reasons, notwithstanding the reasoning of *Oliveras,* we find no violation of the Fifth Amendment in the requirement of §§ 3553(f), 5C1.2 and 2D1.1(b)(4) that the defendant disclose relevant conduct beyond what is included in the offense of conviction in order to obtain the benefit of the safety valve. Our ruling in no way disturbs the holding of *Oliveras* that § 3E1.1 requires the defendant to "accept responsibility" only for the conduct to which he had pled guilty in order to earn credit for acceptance of responsibility.

## III. CONCLUSION

In order to qualify for the benefits of the safety valve provided by 18 U.S.C. § 3553(f) and U.S.S.G. §§ 5C1.2 and 2D1.1(b)(4), the defendant was required to disclose his drug dealings that were part of a common scheme or plan, or part of the same course of conduct, with his offense of conviction. Accordingly, we affirm the judgment of the district court.

---

10. The fact that defendants who provide information as to others and enter into a cooperation agreement with the government are given the additional benefit under § 1B1.8 of not having their disclosed relevant conduct enhance their base offense level is consistent with the goal of rewarding the defendant who provides additional information and cooperates with the authorities concerning other persons' criminal conduct.